IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

CHRISTINA L.,[1]

    Plaintiff,

v.

COMMISSION OF THE SOCIAL SECURITY ADMINISTRATION,

    Defendant.

Civ. No. 3:21-cv-00834-MC

OPINION AND ORDER

MCSHANE, Judge:

    Plaintiff Christina L. brings this action for judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her application for Title XVI Social Security Income. For the reasons set forth below, the Commissioner's decision is reversed, and this case is remanded for the immediate payment of benefits.

---

[1] In the interest of privacy, this opinion uses only the first name and initial of the last name of the non-governmental party or parties in this case. Where applicable, this opinion uses the same designation for a non-governmental party's immediate family member.

Page 1 – OPINION AND ORDER

## PROCEDURAL BACKGROUND

Born in 1973, plaintiff alleged disability beginning March 1, 2009, due to back pain, anxiety, prediabetes, and insomnia. Tr. 158, 214. Her application was denied initially and upon reconsideration. Tr. 105-11. Plaintiff subsequently amended her alleged onset date to October 30, 2018, to coincide with her application date. Tr. 41, 206. On September 8, 2020, a telephonic hearing was held before an Administrative Law Judge ("ALJ"). Plaintiff was represented by counsel and testified, as did a vocational expert ("VE"). Tr. 37-66. On October 21, 2020, the ALJ issued a partially favorable decision, finding plaintiff disabled for the closed period of October 30, 2018, through December 31, 2019. Tr. 16-32.

## THE ALJ'S FINDINGS

At step one of the five step sequential evaluation process, the ALJ found plaintiff had not engaged in substantial gainful activity since the amended alleged onset date. Tr. 19. At step two, the ALJ determined the following impairments were medically determinable and severe: "history of cervical fusion with cervical radiculopathy, lumbar spine condition, and obesity." *Id.* At step three, the ALJ found plaintiff's impairments, either singly or in combination, did not meet or equal the requirements of a listed impairment. Tr. 22.

Because she did not establish presumptive disability at step three, the ALJ continued to evaluate how plaintiff's impairments affected her ability to work. The ALJ resolved that, between October 30, 2018, and December 31, 2019, plaintiff had the residual function capacity ("RFC") to perform light work as defined in 20 C.F.R. § 416.967(b) except:

> she could stand and walk for four hours in an eight-hour day and could perform work that allowed for alternating between standing and sitting after 30 to 60 minutes with a brief change in position; could occasionally climb ramps and stairs, but could never climb ladders, ropes, or scaffolds; could occasionally balance, stoop, kneel, crouch, and crawl; could occasionally reach overhead bilaterally, could frequently reach in all other directions bilaterally; could frequently handle

>and finger bilaterally; and would be off task 20 percent of the workday or would be absent two or more days per month.

*Id.* Based on this RFC, the ALJ concluded that plaintiff could not perform her past relevant work or any other representative occupation. Tr. 27-28.

However, the ALJ found that "[m]edical improvement occurred as of January 1, 2020." *Id.* The ALJ therefore went on to reassess plaintiff's impairments, ultimately crafting an identical RFC to the previous, with the exception of plaintiff being off-task/absent. Accordingly, beginning on January 1, 2020, the ALJ determined plaintiff had the RFC to perform light work as defined in 20 C.F.R. § 416.967(b) except:

>she can stand and walk for four hours in an eight-hour day and can perform work that allows for alternating between sitting and standing after 30 to 60 minutes with a brief change in position; can occasionally climb ramps and stairs but can never climb ladders, ropes, or scaffolds; can occasionally balance, stoop, kneel, crouch, and crawl; can occasionally reach overhead bilaterally and can frequently reach in all other directions bilaterally; and can frequently handle and finger bilaterally.

Tr. 29.

At step four, the ALJ found plaintiff could perform her past relevant work as a clerk/typist. Tr. 30. Alternatively, the ALJ concluded that plaintiff was capable of other work existing in significant numbers in the national economy as of January 1, 2020, such as office helper, courier, and photocopy operator. Tr. 30-31.

## DISCUSSION

This appeal hinges on whether plaintiff experienced medical improvement sufficient to overcome the presumption of continuing disability. Specifically, plaintiff argues the ALJ erred by: (1) rejecting her subjective symptom statements concerning the extent of her impairments on or after January 1, 2020; and (2) discrediting the February 2020 opinion of primary care physician Gwen Casey-Ford, M.D.

I.      **Plaintiff's Testimony**

When a claimant has medically documented impairments that could reasonably be expected to produce some degree of the symptoms complained of, and the record contains no affirmative evidence of malingering, "the ALJ can reject the claimant's testimony about the severity of . . . symptoms only by offering specific, clear and convincing reasons for doing so." *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996). The reasons proffered must be "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony." *Orteza v. Shalala*, 50 F.3d 748, 750 (9th Cir. 1995) (internal citation omitted).

In formulating the RFC, the ALJ is not tasked with "examining an individual's character" or propensity for truthfulness, but instead assesses whether the claimant's subjective symptom statements are consistent with the record. SSR 16-3p, *available at* 2016 WL 1119029. If the ALJ's finding regarding the claimant's subjective symptom testimony is "supported by substantial evidence in the record, [the court] may not engage in second-guessing." *Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002).

At the hearing, plaintiff testified that she was unable to work due to spinal problems and corresponding pain: "in regard to my cervical spinal issues, I have severe pain in my neck and radiating into my shoulders, sometimes my arms and hands [and pain] related to my lower back and hips [that goes] down to my legs and my feet [and results in] swelling." Tr. 44. Her radiating pain was "worse in the morning [and persists at that level] at least a couple hours to several hours a day [and] sometimes at night." Tr. 45. As a result, plaintiff endorsed limited use of her hands, restrictions in standing and walking, and the need to lay down to decompress her spine. Tr. 45-46. Plaintiff also reported depression and anxiety as a result of her back problems, which caused her

to "get overwhelmed easily." Tr. 46-47. Plaintiff nonetheless explained that her mental health had improved but "the pain has gotten worse despite weight off, despite the physical therapy, stretching exercise that I do for my neck and lower back." Tr. 53.

As for medications, plaintiff testified that she currently took "Cymbalta for pain, anxiety and depression, Gabapentin for neck pain, Flexeril, a muscle relaxer, Ibuprofen for inflammation, and Subutex for chronic pain and nerve pain." Tr. 48. She explained that she had been using "Percocet to manage the pain" but her new doctor recently switched her to Subutex, so she was "still in the adjustment period" and "having issues managing the pain." *Id.* In terms of daily activities, plaintiff stated: "I rely on my husband [but try to do minor tasks, such as] wiping down the counters or like sorting laundry . . . it's like hour to hour how I feel during the day, so I couldn't probably quantify what I do around the house, not a whole lot more as far as chores go." Tr. 49-50. In terms of caring for her son, who was ten years old, she remarked that, prior to COVID-19, she would get him up and ready for school and off to the bus stop. Her husband, however, stopped working so he could assist with her son's care, as "his mental health issues [were] getting too much for [plaintiff] to handle on [her] own." Tr. 51.

After summarizing her hearing testimony, the ALJ concluded that plaintiff's medically determinable impairments could reasonably be expected to produce some degree of symptoms, but her "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." Tr. 29. According to the ALJ, the record showed that plaintiff "was improving in 2019 and supports a finding that she was capable of work by late 2019 or early 2020 at the latest, as evidenced by an increase in activities of daily living and decrease in pain." *Id.* In particular, the ALJ cited to: (1) the effectiveness of plaintiff's medications; (2) plaintiff's ability

Page 5 – OPINION AND ORDER

to care for her son and father, attend to housework, and manage her and her son's medical appointments; and (3) the lack of findings on physical examination. Tr. 25, 29-30.

Initially, plaintiff's providers performed few, if any, meaningful physical examinations during the relevant timeframe. Yet, as addressed below, the examinations that do exist in the record before the Court are not overwhelmingly indicative of improvement. *See* Def.'s Resp. Br. 11 (doc. 13) (recognizing that "[t]he record contains a combination of positive and negative examination findings"). As such, the dearth of "significant physical examination" findings is not a legally valid reason to discount plaintiff's testimony. Tr. 30.

This is especially appropriate considering the nature of plaintiff's alleged disability. Notably, as the Commissioner acknowledges, plaintiff has "a history of 'severe' spinal impairments" that have been "confirmed" via "physical examinations and diagnostic imaging [showing] significant neck and back problems." Def.'s Resp. Br. 3 (doc. 13). Indeed, plaintiff underwent a cervical anterior fusion in November 2011 and subsequent imaging studies through 2018 show mild to moderately severe stenosis at multiple levels and advanced degenerative disc disease throughout the lumbar and cervical spine, which correspond to a decreased range of motion, tenderness, spasms, and radiculopathy. Tr. 385-94, 477-78, 497-98, 556-59, 561-71.

Courts within this District have been clear that even "mild degenerative disc disease can have disabling effects." *See, e.g.*, *Dahl v. Comm'r*, 2015 WL 5772060, at *5 (D. Or. Sept. 30, 2015) (collecting cases); *Ellefson v. Colvin*, 2016 WL 3769359, at *6 n.5 (D. Or. July 14, 2016). And "degenerative disc disease is a condition that, by definition, progressively worsens over time." *Odell C. v. Comm'r of Soc. Sec. Admin.*, 2020 WL 8455477, at *3 (D. Or. Oct. 13), *adopted by* 2020 WL 7779067 (D. Or. Dec. 31, 2020) (citation and internal quotations omitted); *see also* Tr. 818 (Dr. Casey-Ford denoting that plaintiff's conditions are the type that "worsen over time").

Page 6 – OPINION AND ORDER

The Commissioner is nonetheless correct that plaintiff experienced some symptom improvement towards the end of 2019 when she her short-acting narcotics prescription was increased. But an independent review of the record reveals that such improvement was not sustained. *See Reddick v. Chater*, 157 F.3d 715, 722-23 (9th Cir. 1998) (ALJ's "paraphrasing of record material" was "not entirely accurate regarding the content and tone of the record" and did not support an adverse credibility finding). In other words, while "evidence of medical treatment successfully relieving symptoms can undermine a claim of disability," the longitudinal record here does not comprise substantial evidence adequate to support the ALJ's decision.[2] *Wellington v. Berryhill*, 878 F.3d 867, 876 (9th Cir. 2017).

As of the alleged onset date, plaintiff reported persistent neck, back, arm, and hip pain, as well as imbalance, dizziness, and tingling in her hands. *See, e.g.*, Tr. 476-79, 501, 503-04, 609, 611. In early 2019, she continued to report significant pain despite her then-existing medications (i.e., g Cymbalta, Gabapentin, and Flexeril) and the addition of Prednisone and Percocet. Tr. 797. In April 2019, plaintiff described her pain as "overwhelming." Tr. 776. In May 2019, plaintiff complained of worsening back pain and noted right-footed numbness; Suboxone and Subutex were trialed but ultimately discontinued due to side effects. Tr. 790-94.

---

[2] To the extent the Commissioner relies on the brief period in which plaintiff was more capable of tending to her personal needs, caring for her child, helping her father during his illness, and performing household chores, her argument is misplaced for two reasons. First, as addressed herein, any such improvement was temporary. *See Lester v. Chater*, 81 F.3d 821, 833 (9th Cir. 1995) ("[o]ccasional symptom-free periods – and even the sporadic ability to work – are not inconsistent with disability"); *see also Benton v. Comm'r of Soc. Sec. Admin.*, 2022 WL 2071980, at *4 (D. Ariz. June 9, 2022) ("[a]s the Ninth Circuit has previously discussed, the presence of waxing and waning of symptoms during the treatment period do not necessarily indicate an ability to maintain employment, nor do some symptoms improving negate a treating provider's opinion"). Second, the extent of those activities is not delineated within the record, such that there is no apparent inconsistency with plaintiff's hearing testimony. *See Treviso v. Berryhill*, 871 F.3d 664, 676 (9th Cir. 2017) (absent specific details about claimant's childcare responsibilities, "those tasks cannot constitute 'substantial evidence'").

Page 7 – OPINION AND ORDER

As a result, in June 2019, plaintiff was placed on short-acting narcotics. Tr. 798. In July 2019, plaintiff reported the "increase in Percocet has been helpful," which enabled her to do more physical activity and, in turn, improved her mood. Tr. 787. She was caring for her son, who was on summer break, and assisting her ill father by keeping him company and driving him to appointments. *Id.* In August 2019, she reported chronic pain and "a two week flare of her low back" and hip, but was nonetheless being more active with housework and self-care activities on "two Percocet per day," commenting "slowly but surely I am claiming my life back." Tr. 1001. In September and October 2019, after receiving hip injections, plaintiff experienced less pain with walking. Tr. 988, 997.

In November 2019, plaintiff presented with increased pain, so her Percocet prescription was correspondingly increased. Tr. 985. In December 2019, plaintiff once again disclosed improved stress and activity levels; she spent less time in bed, was able to attend appointments, stayed busy caring for her son, performed household chores, and participated in a women's empowerment group. Tr. 852, 926, 946, 966. Nevertheless, she was "contin[uing] to struggle" with chronic pain and requested an increase in her Percocet prescription. Tr. 966.

On January 30, 2020, plaintiff attended an appointment for trigger point injections and reported pain on the right side of her rib cage and lower back at a level of 8/10. Tr. 956. On examination, her doctor observed that she had tenderness causing radiating pain in her trapezius muscles and the right side of her middle back. Tr. 959. The following day, plaintiff returned to her doctor for medication refills and stated that, although she feels her medication had greatly improved her level of activity, her pain was not significantly reduced and her lower back "has been flaring up." Tr. 946. Her trigger point injections from the previous day helped some but not completely. *Id.* At that time, her provider denoted that plaintiff "has tried multiple alternative

modalities in past" – e.g., she has been to the "OHSU spine clinic," "done physical therapy + aquatic physical therapy," sought "counseling regarding chronic pain management," participated "in women's empowerment group at [her] apartment," and has tried "[m]ultiple non-opiate medications." Tr. 824.

On February 10, 2020, plaintiff attended appointments for diabetes management, annual wellness, and therapy. Tr. 930, 934, 942-43. At her wellness exam, she requested a disabled parking permit due to her chronic pain and degenerative joint disease, which her doctor provided. Tr. 934. She also requested imaging of her hips due to chronic pain. *Id.* At her therapy intake appointment, she complained of ongoing stress, anxiety, and chronic pain, and requested to see a therapist to address her mental health needs. Tr. 942-43. Later that month, plaintiff called her doctor's office because she had been out of Percocet for "3 days [due to a clerical issue and was in] so much pain [she] can barely walk." Tr. 928. Plaintiff had imaging of her hips taken at the end of February, which found signs of chronic gluteal tendinitis. Tr. 925.

In April 2020, plaintiff presented with frequent flareups of her neck pain, which interfered with her sleep. Tr. 915. In June 2020, plaintiff reported struggling with her mental health symptoms, feeling overwhelmed, and having a hard time managing her son's needs during quarantine. Tr. 912-13. She also indicated that she did not have enough stamina to complete her daily activities, so tasks would pile up, making her feel worse. *Id.* The following week, plaintiff started mental health treatment, describing chronic pain and stress associated with the pandemic. Tr. 908. Later that month, plaintiff remarked that she was working on her self-care by trying to complete one appointment per week. Tr. 906. At her subsequent appointment, she reiterated her difficulties focusing on tasks and was prescribed ADHD medication. Tr. 904.

In July 2020, plaintiff attended a medical appointment, and commented that it took longer to start her days due to stiffness in her neck and shooting pain in her back. Tr. 892. She was noted to have back and neck pain and stiffness upon examination. *Id.* Plaintiff's provider adjusted her medications in the hopes of making them more effective. Tr. 893. At a later therapy appointment, she reported being "[i]n a lot of pain right now, chronic neck and back pain," with limited mobility due to back spasms. Tr. 890. She also reported difficulty sleeping and completing tasks due to pain. *Id.* At additional medical appointments in July, plaintiff continued to experience "[l]ots of pain" despite medication adjustments. Tr. 874-78, 882-83.

There is nothing in the record that belies the aforementioned evidence or otherwise suggests plaintiff's pain markedly improved or that she was able to sustain an increased activity level. In fact, plaintiff's most recent records leadings up to the ALJ hearing, from August 2020, reflect ongoing anxiety, difficulty completing tasks and sleeping, and chronic pain. Tr. 852, 855, 860-61, 863-64, 867-70, 872.

In sum, the record establishes that plaintiff experienced some medical improvement through approximately the first month of 2020, but then had a significant return of her pain despite regular treatment and medication compliance. The ALJ erred in evaluating plaintiff's subjective symptom testimony concerning the extent of her impairments during 2020.

## II. Medical Opinion Evidence

Where, as here, the plaintiff's application is filed on or after March 27, 2017, the ALJ is no longer tasked with "weighing" medical opinions, but rather must determine which are most "persuasive." 20 C.F.R. § 416.920c(a)-(b). "To that end, there is no longer any inherent extra weight given to the opinions of treating physicians . . . the ALJ considers the 'supportability' and 'consistency' of the opinions, followed by additional sub-factors, in determining how persuasive

the opinions are." *Kevin R. H. v. Saul*, 2021 WL 4330860, at *4 (D. Or. Sept. 23, 2021). The ALJ must "articulate . . . how persuasive [they] find all of the medical opinions" and "explain how [they] considered the supportability and consistency factors." *Id.* At a minimum, "this appears to necessitate that an ALJ specifically account for the legitimate factors of supportability and consistency in addressing the persuasiveness of a medical opinion." *Id.*

In February 2020, plaintiff's longstanding treating provider, Dr. Casey-Ford, completed a "Physical Capacity Statement." Tr. 815-19. Dr. Casey-Ford listed plaintiff's diagnoses as "cervical [and] lumbar degenerative disc disease and spinal stenosis."[3] Tr. 815. She opined, in relevant part, that plaintiff could stand/walk or sit for less than two hours total in an eight-hour workday, and would need additional breaks (i.e., one every hour for 15-30 minutes). Tr. 815-16. Dr. Casey-Ford also indicated that plaintiff could not tolerate even a low stress job and would be absent from work because of her physical conditions more than three days per month. Tr. 817-18. In the narrative portion of her report, Dr. Casey-Ford stated extra breaks were necessary due to plaintiff's "increased pain w/ activity"; increased fatigue caused by pain and, by extension, "poor sleep"; and "medication side effects." Tr. 817. Additionally, she explained that plaintiff "has consistently reported the above symptoms [and] level of function [and] they are consistent w/ her diagnoses." Tr. 818.

The ALJ discounted Dr. Casey-Ford's opinion for two reasons. First, the ALJ found that "many of the limitations were based on [plaintiff's] subjective reports, which are not entirely

---

[3] Dr. Casey-Ford also listed fibromyalgia separately as a diagnosis, but her chart notes suggest that this impairment was unlikely to materially impact plaintiff's functioning in light of her cervical and lumbar issues. Tr. 815. Specifically, Dr. Casey-Ford stated: "[Plaintiff] meets ACR diagnostic criteria for fibromyalgia . . . although since her pain areas are strongly related to areas where she has known anatomic problems (neck/low back) and some of her other symptoms could easily be medication side effects, the diagnosis may be equivocal. However, I think it likely that she has some component of centralized pain." Tr. 602.

Page 11 – OPINION AND ORDER

consistent with the objective findings of record." Tr. 26. Second, according to the ALJ, "Dr. Casey-Ford's treatment records show that in late 2019 [plaintiff] was improving as evidenced by increased activity and decreased pain." *Id.*

As addressed in Section I, neither of these rationales are reasonable in light of the tone and content of the record. Significantly, consistent with Dr. Casey-Ford's opinion, the limited objective findings that do exist tend to corroborate, rather than detract from, plaintiff's subjective symptom statements. *See Ritchotte v. Astrue*, 281 Fed.Appx. 757, 759 (9th Cir. 2008) (reversing the ALJ's evaluation of the medical opinion evidence under analogous circumstances). Moreover, the medical evidence does not, in fact, demonstrate an appreciable or sustained improvement in pain symptoms as of "late 2019." Tr. 26. The ALJ therefore erred in assessing Dr. Casey-Ford's opinion.

### III.     Remedy

The decision whether to remand for further proceedings or for the immediate payment of benefits lies within the discretion of the court. *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1101-02 (9th Cir. 2014). Nevertheless, a remand for an award of benefits is generally appropriate when: (1) the ALJ failed to provide legally sufficient reasons for rejecting evidence; (2) the record has been fully developed, there are no outstanding issues that must be resolved, and further administrative proceedings would not be useful; and (3) after crediting the relevant evidence, "the record, taken as a whole, leaves not the slightest uncertainty" concerning disability. *Id.* at 1100-01 (citations omitted); *see also Dominguez v. Colvin*, 808 F.3d 403, 407-08 (9th Cir. 2015) (summarizing the standard for determining the proper remedy).

In this case, the ALJ erred by failing to provide a legally sufficient reason, supported by substantial evidence, for rejecting plaintiff's subjective symptom testimony. Likewise, the ALJ

Page 12 – OPINION AND ORDER

erred in evaluating Dr. Casey-Ford's opinion that, amongst other things, plaintiff would need extra breaks due to her impairments and miss more than three days of work per month. Indeed, there is not a single medical opinion in the record suggesting that plaintiff could perform work consistent with the RFC. Even the state agency consulting sources opined that plaintiff could only stand and/or walk for two hours in an eight-hour day. Tr. 76, 91.

Additionally, the Commissioner has not pointed to any evidence that casts into serious doubt the debilitating extent of plaintiff's impairments. *See* Def.'s Resp. Br. 12 (doc. 13) (citing to the state agency consulting source opinions, which were rendered in April and October 2019 – i.e., at the time the ALJ already determined plaintiff was disabled due to her physical impairments – as well as an April 2019 psychological assessment from Chelsea MacLane, Psy.D., which suggested that it would be difficult for plaintiff to maintain employment due to pain).

Thus, the record has been fully developed and there are no outstanding issues left to be resolved. That is, the ALJ determined plaintiff's conditions were disabling as of the alleged onset date and as discussed herein, there is no indication that those conditions, at least one of which is degenerative in nature, improved in a meaningful or sustained manner after December 31, 2019. Further, the VE testified that a hypothetical individual who was off task 10% of the day or absent two or more days per month could not maintain competitive employment. Tr. 62. Accordingly, the Court, in its discretion, credits the improperly rejected evidence as true and finds that plaintiff experienced continuing disability after December 31, 2019.

## **CONCLUSION**

For the foregoing reasons, the Commissioner's decision is REVERSED, and this case is REMANDED for the immediate and continued payment of benefits as of January 1, 2020.

IT IS SO ORDERED.

DATED this 29th day of September 2022.

    s/Michael J. McShane  
Michael J. McShane  
United States District Judge

Page 14 – OPINION AND ORDER